## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ADAM TRUBOW, and**
**PATRICK MCBRIDE,**

**Plaintiffs,**

**v.**

Case No.:  1:20 CV 01248

**DAVID C. KRAMER,**
**Assistant Attorney General,**
**sued in his individual capacity for damages;**
**KENNETH C. OWENS,**
**Assistant Attorney General,**
**sued in his individual capacity for damages;**
**LORI CHAVEZ,**
**Assistant Attorney General,**
**sued in her individual capacity for damages;**
**LYN CARTER,**
**Chief Investigator for the New Mexico**
**Real Estate Commission,**
**sued in his individual capacity for damages;**
**WAYNE CIDDIO,**
**Executive Secretary of the New Mexico**
**Real Estate Commission,**
**sued in his individual capacity for damages and his**
**official capacity for equitable relief;**
**GRETCHEN KOETHER, President**
**of the New Mexico Real Estate Commission,**
**sued in her official capacity for equitable relief;**
**BILL DAVIS, Vice President**
**of the New Mexico Real Estate Commission,**
**sued in his official capacity for equitable relief;**
**GREG L. FOLTZ, Secretary**
**of the New Mexico Real Estate Commission,**
**sued in his official capacity for equitable relief;**
**KURSTIN JOHNSON, Member**
**of the New Mexico Real Estate Commission,**
**sued in her official capacity for equitable relief; and**
**LINDSAY ROLLINS, Public Member**
**of the New Mexico Real Estate Commission,**
**sued in his official capacity for equitable relief,**

**Defendants.**

1

## COMPLAINT FOR DENIAL OF CONSTITUTIONAL RIGHTS
## AND DEMAND FOR TRIAL BY JURY

Plaintiffs, Adam Trubow and Patrick McBride, through their undersigned counsel, FELKER, ISH, RITCHIE, GEER & WINTER, P.A. (Mark L. Ish, William D. Winter, and Gregory S. Smithkier) bring this action for damages, injunctive and declaratory relief, and demand a trial by jury on all issues triable of right by a jury.

### PARTIES

1.      Plaintiff Adam Trubow was licensed as a New Mexico real estate broker for almost 14 years before his license was revoked by the New Mexico Real Estate Commission, and at times material to this Complaint was President of TAL Realty Inc. ("TAL Realty"), a New Mexico corporation.

2.      Plaintiff Patrick McBride was a licensed New Mexico real estate broker employed by TAL Realty.

3.      Defendant David C. Kramer ("Kramer") is a licensed New Mexico attorney, who at all times material to this Complaint was a New Mexico Assistant Attorney General assigned to the Consumer Protection Division. For purposes of this action, Kramer is sued in his individual capacity for damages.

4.      Defendant Kenneth C. Owens ("Owens") is a licensed New Mexico attorney, who at all times material to this Complaint was a New Mexico Assistant Attorney General assigned to the Consumer Protection Division. For purposes of this action, Owens is sued in his individual capacity for damages.

5.      Defendant Lori Chavez ("Chavez") is a licensed New Mexico attorney, who at all times material to this Complaint was a New Mexico Assistant Attorney General assigned as co-Deputy Director of the Consumer Protection Division while at the same time, and/or later, acting

as legal counsel for the New Mexico Real Estate Commission. Defendant Chavez supervised Defendants Kramer and Owens who were her subordinates in the Consumer Protection Division. For purposes of this action, Defendant Chavez is sued in her individual capacity for damages.

6.      Defendant Lyn Carter ("Carter") is a licensed New Mexico Real Estate Broker, who at times material to this Complaint was Plaintiffs' competitor, while advising and consulting with the New Mexico Real Estate Commission and later becoming the Commission's Chief Investigator. For purposes of this action, Defendant Carter is sued in his individual capacity for damages.

7.      Defendant Wayne Ciddio ("Ciddio") was at all times material to this Complaint the Executive Secretary for the New Mexico Real Estate Commission, a state agency administratively attached to the regulation and licensing department. For purposes of this action, Defendant Ciddio is sued in his individual and official capacity for damages and equitable relief.

8.      Defendant Gretchen Koether ("Koether") was at all times material to this Complaint, and is, the President of the New Mexico Real Estate Commission. For purposes of this action, Defendant Koether is sued in her official capacity for equitable relief.

9.      Defendant Bill Davis ("Davis") was at all times material to this Complaint, and is, the Vice-President of the New Mexico Real Estate Commission. For purposes of this action, Defendant Davis is sued in his official capacity for equitable relief.

10.      Defendant Greg L. Foltz ("Foltz") was at all times material to this Complaint, and is, the Secretary of the New Mexico Real Estate Commission. For purposes of this action, Defendant Foltz is sued in his official capacity for equitable relief.

11.    Defendant Kurstin Johnson ("Johnson") was at all times material to this Complaint, and is, a Member of the New Mexico Real Estate Commission. For purposes of this action, Defendant Johnson is sued in her official capacity for equitable relief.

12.    Defendant Lindsay Rollins ("Rollins") was at all times material to this Complaint, and is, the Public Member of the New Mexico Real Estate Commission. For purposes of this action, Defendant Rollins is sued in his official capacity for equitable relief.

## JURISDICTION AND VENUE

13.    This Complaint asserts claims arising under the Constitution and laws of the United States, including the First, Fifth and Fourteenth Amendments to the United States Constitution. Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3).

14.    Venue is properly laid in this district as Defendants Kramer and Owens, at all times material to this Complaint, were employed by the Office of the New Mexico Attorney General, the main office of which is located in Santa Fe County, State of New Mexico. Other individual Defendants named herein reside, upon information and belief, in the State of New Mexico, both Plaintiffs reside in Bernalillo County, State of New Mexico, and all of the material acts and/or omissions complained of herein occurred in this federal judicial district.

15.    Pursuant to 42 U.S.C. § 1983, this Complaint seeks redress for the deprivation, under color of state law, of Plaintiffs' Constitutional rights as guaranteed them by the First, Fifth and Fourteenth Amendments to the United States Constitution.

## INTRODUCTORY SUMMARY

16.    Plaintiffs bring this action for damages, injunctive and declaratory relief arising out of the unconstitutional revocation of Plaintiffs' real estate brokers' licenses by the New Mexico

4

Real Estate Commission through the intentional, knowing and concerted action of Defendants in using information obtained in violation of Plaintiffs' attorney-client privilege, and in a multi-year pattern of willful obstruction by Defendants' of Plaintiffs' efforts to uncover the basis of the claims against them through concealment and spoliation of evidence.  The acts combined to taint and corrupt the administrative revocation hearing and subsequent appeal. Moreover, the punishment meted out by the New Mexico Real Estate Commission was discriminatory, arbitrary, and unjust when compared to the punishment inflicted upon similarly situated real estate brokers. The wrongful actions of Defendants give rise to causes of action for violation of Plaintiffs' rights to procedural and substantive due process, denial of the right of access to the courts, and right to equal protection guaranteed by the United States Constitution.

## FACTUAL ALLEGATIONS

### The Attorney General Office's Participation in the National Mortgage Settlement

17.    In 2007, the booming residential mortgage-origination industry began to stumble as the rate of mortgage defaults accelerated. These defaults stemmed from the industry's sloppy or abusive underwriting and origination practices and its securitization of pools of mortgage originated through the practices. As the number of mortgage defaults climbed, mortgage servicers struggled. In time, the rising defaults led to collapse of the market for mortgage-backed securities. This, in turn, led to Lehman Brothers' bankruptcy in 2008 and the onset of a decade-long mortgage foreclosure crisis.

18.    In the wake of the collapse of the mortgage market, the United States Justice Department sued major lending institutions, which in 2012 culminated in a settlement commonly known as the National Mortgage Settlement.

5

19.     New Mexico received $11,174,579 in settlement funds and in connection with that award the New Mexico Attorney General's Office issued a Request for Proposal for expenditure of such funds to expand services to address the mortgage default crisis. Among other organizations that were awarded portions of such funds was United South Broadway Corporation ("USBC"), a local housing and mortgage foreclosure defense and advocacy organization.

20.     In the wake of receiving the settlement funds, the Attorney General's Office set up the Homeownership Preservation Program staffed by employees, including Defendants Owens and Kramer. Defendant Owens almost immediately after being hired for this job became immersed and involved in the day-to-day operations of USBC. The Homeownership Preservation Program was run by senior Assistant Attorneys General, including Defendants Chavez, Owens and Kramer within the Attorney General's Consumer Protection Division.

### The Donham Foreclosure

21.     On October 19, 2010, Chase Home Finance, LLC, brought a residential mortgage foreclosure action against Lisa Donham ("Donham") in the Second Judicial District Court, State of New Mexico.

22.     On December 20, 2010, Donham assigned her statutory right of redemption under New Mexico law to TAL Realty.

23.     At the time Donham assigned her right of redemption to TAL Realty, the property that was the subject of the Chase foreclosure action was vacant, having been abandoned by Donham, who was approximately $30,000 underwater on the mortgage debt.

24.     TAL Realty acquired statutory redemption rights from owners whose homes were being foreclosed. The financial incentive for exercising a redemption right stems from the fact that bids offered at judicially supervised foreclosure sales commonly are below market, sometimes

substantially so. The potential for profiting on the subsequent sale of the home at or near its market value is measured by the difference between the home's market value sales price and the bidder's low acquisition cost. In New Mexico, a homeowner's statutory right of redemption is nine (9) months unless reduced in the mortgage to a period not less than thirty (30) days following judicial sale.

25.     Until a court enters an order approving the sale, title to the home in foreclosure remains with the defendant owner-mortgagor. Absent an order approving the sale, the special master does not have the power or authority to execute a valid deed to the successful bidder. If the sale is approved and the property is not redeemed, the defendant owner-mortgagor's title is ousted and the title vests in the judicial purchaser. Conversely, if a third-party acquires the owner's redemption right by assignment and successfully redeems it, then the judicial purchaser's provisional title is ousted and title vests in the redeemer.

26.     The lower the bid is relative to the property's market value, the greater the profit potential in acquiring the foreclosed home and reselling it. If the redeemer matches the successful bidder's low bid, it can compel the successful bidder to sell the property to it at a price equal to the low bid. The redeemer can then sell the property at market value, thereby capturing the profit, as provided in applicable New Mexico law.  The process is entirely legal, and serves an important public policy—e.g., it provides an efficient mechanism for returning foreclosed properties to productive use.

27.     In or about late 2013 USBC began working with Donham, and on January 16, 2014, Scott Cameron, who, at that time, was a staff attorney with USBC, entered his appearance in the Chase Foreclosure Action on Donham's behalf. Mr. Cameron later came to work for the Attorney General's Office in the Consumer Protection Division.

**Defendant Kramer Begins Investigating Mortgage Foreclosure "Scams"**

28.     On December 5, 2012, Defendant Kramer was himself sued in a mortgage foreclosure action by Wells Fargo Bank, NA., which action was pending until May 16, 2013. He was represented in that action by an attorney for USBC, in her individual capacity.

29.     On April 13, 2013, Defendant Lyn Carter was a real estate broker who acquired on his own account at judicial sale a property in foreclosure located at 8824 Horacio PL, NE, in Albuquerque through a Special Master's Deed. TAL Realty held the right of redemption on the same property, and after being informed of this fact Defendant Carter wrongfully and intentionally interfered with TAL Realty's redemption rights, and only relented after suit against him was threatened.

30.     Before becoming Chief Investigator for the Real Estate Commission after March 1, 2015, Defendant Carter actively assisted, consulted with and provided his expertise to the Consumer Protection Division of the Attorney General's Office on matters related to Plaintiffs' business model and activities, and in "targeting" Plaintiffs, while specifically requesting that he "remain anonymous" in such activities.

31.     Prior to dismissal of the foreclosure case against him in May 2013, Defendant Kramer became suspicious of bidders at foreclosure sales who were offering bids at foreclosure sales that he believed were substantially below the homes' market values, including as low as 15% of the homes' values, and attributed the practice to "highly suspicious circumstances". On May 30, 2013, Defendant Kramer met with Jacque Moise, an investigator for the New Mexico Real Estate Commission, and Defendant Carter to discuss what Defendant Kramer viewed as "scams" in the foreclosure process.

32.     Defendant Kramer was motivated to investigate Plaintiffs, not by the merits of the facts, but by animosity generated by his own personal experience as a Defendant in a foreclosure case. Kramer used his official power as an Assistant Attorney General to launch a crusade against Plaintiffs and TAL Realty whom he viewed as "scammers" in the foreclosure process, and was assisted in that endeavor by Defendant Carter, who also was motivated by personal animosity.

33.     One of those cases in which Kramer took a keen interest was the matter of *Bank of America v. Ali Sharifi*. In that case, the judicially-approved successful bid was $39,000 for a home Defendant Kramer speculated was worth  $300,000 "or more". He deemed the bid to be "grossly low". Nonetheless, the court approved the bid. TAL Realty acquired the redemption right, deposited $40,000 into the court's registry and filed its redemption petition. The court granted the petition and issued a certificate of redemption, vesting title to the home in TAL Realty. Nevertheless, Defendant Kramer believed – without any substantiation – that the "grossly undervalued sale" was "consistent with collusion or price-fixing with the third party and/or the special master," and on July 22 he notified the mortgage lender of his unsubstantiated suspicions. On August 21, 2013,  Defendant Kramer forwarded his July 22 email to Bank of America to Defendant Owens with an instruction to: "print and save for TAL Realty. Just in case we have further issues in the future, I will have Janet open a litigation file and close it."

34.     On or about August 21, 2013, Defendant Kramer opened a litigation file on TAL Realty, Inc., through which to conduct further investigation into the company and possible violations of the New Mexico Unfair Practices Act.

35.     The opening of that file caused a "litigation hold" on file materials and triggered a duty in the Attorney General's Office to preserve all documents related to that investigation.

36. The *Sharifi* matter was a springboard for Defendant Kramer's investigation of – as he stated – other "targets" who he suspected of "collusion" with lenders and/or special masters.

37. On August 14, 2013, Jacque Moise, an investigator for the Real Estate Commission, emailed Defendant Kramer and asked that he and Defendant Owens meet with Defendant Ciddio, Executive Secretary of the Real Estate Commission, "to discuss our working relationships in an attempt to set up some type of structure by which we communicate." That meeting was held on or about August 19, 2013, and a discussion was had about potential realtor "targets". Upon Plaintiffs' information and belief, the targets included Plaintiffs Trubow, McBride and their company, TAL Realty, Inc.

38. Ms. Moise followed up the meeting by writing to Defendant Kramer and enclosing a list of then-active "NMREC and AG (Consumer Protection Division CASES)".

**<u>Defendants Kramer, Owens and Chavez Mine Plaintiffs' Attorney-Client Privileged and Confidential Information in Connection with the Donham Complaint</u>**

39. On January 15, 2014, Lisa Donham signed a complaint against Plaintiff Trubow and TAL Realty (the "Donham Complaint"), which, upon information and belief, was prepared and written, in whole or in part, on her behalf by either Defendant Kramer or Defendant Owens.

40. On or about May 14, 2014, attorney Cameron with USBC emailed the Donham Complaint to the Attorney General's Consumer Protection Division.

41. On June 5, 2014, Defendant Owens emailed Defendant Kramer, along with Maggie Lightle ("Lightle"), a newly hired paralegal in the Consumer Protection Division, to notify them of the assignment of the Donham Complaint to them.

42. Lightle had previously worked as a paralegal in the Barnett Law Firm, specifically for attorney Colin L. Hunter. Mr. Hunter routinely represented Plaintiffs Trubow, McBride and their related companies in real estate matters, including the Donham foreclosure. In her capacity

as Mr. Hunter's paralegal, Lightle assisted him in handling such real estate matters for Plaintiffs, beginning on, or about, February 5, 2013, and became intimately familiar with their business model, their acquisition of rights of redemption, their exercise, negotiations with lenders and the ultimate acquisition of title to redeemed properties.  Lightle had complete access to attorney Hunter's email, correspondence, notes, writings and all aspects of these files and transactions. Hunter relied upon Lightle for many of the routine and administrative duties associated with the representation of Plaintiffs and their business. Upon information and belief, attorney Hunter had terminated Lightle's employment shortly before she began working with Defendants Kramer, Owens and Chavez in the Attorney General's Office.

43.    Shortly after transferring the investigative file to Defendant Kramer and Lightle, Defendant Owens sent Defendant Kramer and Lightle the state bar information for Colin Hunter and a brief synopsis of the case.

44.    Moments after receiving Defendant Owen's emails on June 5, 2014, Lightle replied, asking Owens and Kramer:

> **"Do I need to let you know if there may be a possible conflict of interest? Personally, I would love to see Mr. Hunter and his client go down in flames and I myself don't have a problem; however, if Mr. Hunter finds out I'm involved, he may think my involvement as a conflict. Please let me know."**

(Emphasis added.) A true and accurate copy of the email chain is attached hereto as Exhibit "A" and incorporated herein by reference.

45.    Defendant Kramer responded by email, stating: "Once we have conducted some interviews, we should set up a meeting with Real Estate Comm'n. Since he [Plaintiff Trubow] is a realtor, any deceptive practices implicate his license."

46.    Lightle continued to work on the Donham Complaint, the investigation of Plaintiffs, and participated in at least two meetings and conversations with Donham. Upon

11

Plaintiffs' information and belief, Lightle provided Defendants Kramer, Owens and Chavez with information about the workings of TAL Realty, its business model, similar transactions, and the names of potential "victims" and witnesses. Lightle provided material assistance to Defendants Kramer, Owens and Chavez in the investigation of Plaintiffs and TAL Realty, Inc., providing them with a road map of the inner workings of her former employer's client.

47.    The attorney–client privilege is enshrined in federal common law as "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

48.     It is axiomatic that the attorney-client privilege (which is among the "rights, privileges and immunities" secured by the Constitution and laws, and protected by §1983) conferred upon Plaintiffs an expectation of privacy in confidential communications with their attorney, Colin Hunter, and his paralegal with whom confidential, private, and proprietary information was routinely shared. Plaintiffs' "informational privacy" interest in their lawyer's files, and communications with counsel, was clearly known to Defendants Kramer, Owens and Chavez when they invaded that privilege through use of Lightle's knowledge and inside information in the course of investigating and constructing a case against Plaintiffs, thereby tainting the subsequent administrative and judicial proceedings.

49.    Despite Lightle's misgivings about a "conflict of interest" and the clear implication that Defendants Kramer and Owens were invading Plaintiffs' attorney-client privilege, Defendants Owens and Kramer saw this as a golden opportunity to construct a theory of wrongful conduct against Plaintiffs and to take advantage of Lightle's animosity toward her former employer and his clients. These Defendants continued to meet with Lightle to investigate TAL Realty's "business model", obtained information from Lightle about transactions like the Donham

Complaint, including the names of potential witnesses and other confidential and proprietary information concerning TAL Realty's transactions that was protected by the attorney-client privilege.

50.     Despite Lightle's admonition and the clear conflict of interest that her work on the Donham Complaint posed, Defendants Owens and Kramer "mined" privileged information from Lightle in violation of New Mexico law and the Rules of Professional Conduct (e.g., Rule 16-110(C)(2), NMRA), and in violation of Plaintiffs' clearly established rights of privacy and confidentiality in their communications with legal counsel. Defendants Owens and Kramer not only failed and refused to remove Lightle from any contact with the file and the investigation, but, instead, continued to actively use her on the case and to solicit information from her. At no time did these Defendants ever disclose to Plaintiffs or their legal counsel that Lightle had been harnessed to participate in the investigation and had direct contact with Donham.

51.     Later on June 5, 2014, Defendant Owens informed Defendant Kramer and Lightle that he had printed a list of instruments (e.g., assignments and deeds) related to TAL Realty transactions, as discussed with Lightle, which TAL Realty had recorded in Bernalillo County, and had placed a list of such transactions in "the investigative folder". He asked Lightle to obtain copies of "11 filings involving TAL in May 2014."

52.     Defendant Chavez was a supervising Assistant Attorney General with oversight of the Consumer Protection Division as that division's acting co-Deputy Director. Upon information and belief, Chavez became aware of, was privy to, and would ultimately access the file and utilize the privileged information to the detriment of Plaintiffs in the course of her representation of the Real Estate Commission as it considered the license revocation cases against Plaintiffs.

13

53.     Defendants Kramer, Owens and Chavez were, at all times material prior to the filing of this Complaint, purporting to act in the course of their investigation of Plaintiffs by the Consumer Protection Division, which investigation was in furtherance of the prosecution of Plaintiffs subsequently conducted by the Real Estate Commission.

54.     In the course of their investigation, Defendants Kramer, Owens and Chavez knowingly and wrongfully used information protected by the attorney-client privilege, which they obtained from Lightle to investigate and build a case against Plaintiffs that might be used by the Attorney General's Office and the Real Estate Commission against Plaintiffs, including, without limitation, causing Lightle to telephone and interview individuals involved in real estate transactions with Plaintiffs.

55.     Despite the obvious conflict of interest and violation of clearly established laws and constitutional protections afforded communications with legal counsel, Lightle continued to work directly on the investigation of Plaintiffs for no fewer than forty (40) days under the supervision and guidance of Defendants Owens, Kramer and Chavez and at their direction.

56.     In setting up Plaintiffs through use of privileged information obtained from their legal counsel, these Defendants acted outside the scope of their  authorized discretionary duties as licensed New Mexico attorneys and assistant attorneys general as set forth in clearly established state law and policies of the attorney general.

57.     On July 1, 2014, Donham met with Defendant Kramer and Lightle "to discuss [her] experience with TAL Realty."

58.     The next day, Lightle referred the Donham complaint to the Real Estate Commission under the cover of letter authored by Defendant Kramer and addressed to Real Estate Commission Investigator Moise.

14

59.     That same day, July 2, Lightle wrote to Donham, enclosing a copy of Kramer's "correspondence ... to Mr. Colin Hunter concerning your case" and informed Donham that "we have forwarded" the correspondence to Moise "for further investigation". A copy of Lightle's letter was not sent to Hunter. Mr. Hunter replied to Defendant Kramer's email, stating that he would review the complaint and forward it to his client.

60.     Later that day, Plaintiff Trubow wrote to Defendant Kramer to advise that he would be represented on the Donham Complaint by attorney Clinton Marrs, and Defendant Kramer thereupon emailed Mr. Marrs, stating "we will likely have to discuss a civil investigative demand."

61.     At no time did Defendants Kramer or Owens disclose to Plaintiffs' attorneys Hunter or Marrs that Paralegal Lightle had been assigned to the case, had actively worked on the investigation for no less then forty (40) days, and had provided Kramer and Owens information about TAL Realty and Plaintiffs, which information she had obtained in the course of her employment with Plaintiffs' legal counsel. In fact, these Defendants and the others named herein took all steps possible, legal or otherwise, over the course of several years to conceal this fact from Plaintiffs and their counsel when they were under a legal duty to have disclosed it.

62.     Donham responded to Lightle's July 2 email on July 4, thanking Lightle and Defendant Kramer for "meeting with me on Tuesday to discuss my experience with TAL Realty," and attaching copies of messages Donham had received from Plaintiff McBride, which Lightle said would be placed in Defendant Kramer's investigation file.

63.     Lightle provided to Defendants Kramer, Owens, and Chavez information directly obtained through her work with Plaintiffs' counsel, including information about Plaintiffs' "business model", leads on other properties involved in TAL Realty's book of business, the pattern of Plaintiffs' business practice through which rights of redemption were acquired, and other

information upon which Defendants Kramer, Owens, Chavez would rely in the course of investigating the cases against Plaintiffs in the Consumer Protection Division, and upon which Assistant Attorney General Rebecca Branch (then co-Deputy Director of Consumer Protection along with Defendant Chavez) would rely in prosecuting the administrative licensure revocation action against Plaintiffs before the Real Estate Commission. The specifics of Plaintiffs business model would become a central theme in the accusations made against Plaintiffs, in the findings and conclusions of the Hearing Officer, and in the Decision and Order of Defendant Real Estate Commission, although none of this information was ever raised by Donham or contained in her Complaint.

64. On or about November 17, 2014, the Real Estate Commission met to consider Notices of Contemplated Action ("NCAs") against Plaintiffs' real estate brokers' licenses, based upon investigative information about TAL Realty's and Plaintiffs' business plan and related practices that had been obtained from Lightle by Defendants Owens and Kramer, or as a consequence of information provided by her.

65. At no time did Real Estate Commission investigators personally interview Donham.

66. The Commission resolved at the meeting to issue the NCAs and subsequently issued the NCAs against Plaintiffs, and while purporting to base its findings upon an unsigned so-called "Broker B Report", in fact relied entirely upon the investigatory work of the Consumer Protection Division and information tainted by violation of Plaintiffs' attorney-client privilege. That Report was ostensibly prepared by Commission Investigator Greg Valdez, but, on information and belief, was authored in whole or in part by Defendant Kramer.

16

67.    Although the Broker B Report purported to provide the Commission with information related to the Donham Complaint, the Report's findings and conclusions were, in fact, derived from privileged information obtained by Defendants Kramer and Owens from Lightle, and went far beyond the sparse facts alleged in the Donham Complaint. The Report alleged facts and information– albeit false and factually inaccurate – provided by Lightle about the activities of Plaintiffs, and their "business plan", including:

- Telling property owners "they are working with the bank to negotiate forgiveness of the foreclosure or short sale or they tell them they will list the property and try to sell it as a short sale."
- That "[w]hile this process draws out over the period of what can sometimes last up to three year, the respondent [sic – referring to Plaintiffs herein] has a tenant move into the property and rents the property during the foreclosure process."
- That "[t]he respondents try to purchase redemption rights at prices elevated and much higher than typical prices for the redemption rights in attempts to inflate the value of the houses or the value of the redemption rights themselves at a later time in attempts to maximize profit."

68.    Even after the Commission had resolved to issue NCAs against Plaintiffs' licenses, Defendant Kramer continued to immerse himself in the investigation of TAL Realty and routinely communicated his suspicions to other Defendants, including Ciddio, Carter and Chavez.

69.    For example, on or about March 4, 2015, Defendant Kramer wrote to the Real Estate Commission's Executive Secretary, Wayne Ciddio, falsely claiming that TAL Realty was "continuing to generate complaints to us."  Except for the Donham matter, at no time did the Attorney General's Office present a shred of evidence establishing complaints against TAL Realty to the Real Estate Commission.

70.    The intentional and knowing invasion of Plaintiffs' attorney-client privilege, and wholesale concealment of that fact at all meaningful times before the revocation hearing, prejudiced Plaintiffs by rendering ineffective their right to a full and fair opportunity to litigate the

17

charges against them, resulting in a hearing tainted by wrongfully obtained evidence, a record on appeal devoid of such facts as would only become known to Plaintiffs after revocation of their licenses and which prejudiced their right of access to the courts, and which ultimately resulted in the deprivation of Plaintiffs' right to procedural and substantive due process guaranteed by the United States Constitution.

71.    Defendant Chavez was assigned to represent the Real Estate Commission in connection with the revocation of Plaintiffs' licenses, although she also meddled in the administrative prosecution of the case against Plaintiffs. Chavez routinely utilized and presented information to the Commission that had been obtained by means of the intentional and knowing violation of Plaintiffs' attorney-client privilege, including information made known to her by Defendants Kramer and Owens, and through her oversight of their work as co-Deputy Director of the Consumer Protection Division.   Such acts were outside the scope of her authorized discretionary duties as a licensed New Mexico attorney and assistant attorney general as set forth in clearly established state law and policies of the attorney general.

72.    The conduct of Defendants Kramer, Owens, Ciddio and Chavez in putting to use information obtained in violation of Plaintiffs' attorney-client privilege, and in the subsequent pattern of obstruction was the cause in fact and the proximate cause of Plaintiffs' denial of due process, denial of access to the courts and the other harm complained of herein.

**The Real Estate Commission's Case Against Plaintiffs and Related Coverup**

73.    More than two years after referral of the Donham Complaint to the Real Estate Commission by Defendant Kramer, on July 8, 2016, the Commission issued Notices of Contemplated Action ("NCAs") against Plaintiffs' real estate licenses.

74.    Upon information and belief, the Broker "B" Report of the Commission's "investigation", which bears the name of Greg Valdez, was actually authored, in whole or in part, and approved by Defendant Kramer.  As previously alleged, it contains allegations of fact wrongfully elicited from and provided to him by Lightle.

75.    The Assistant Attorney General assigned to the Real Estate Commission to prosecute the action against Plaintiff was Rebecca Branch. Branch was also co-Deputy Director of the Consumer Protection Division, overseeing Defendants Owens and Kramer. The Assistant Attorney General assigned to represent the Commission in the proceeding was Defendant Chavez, who was also co-Deputy Director of the Consumer Protection Division, overseeing Defendants Owens and Kramer. Although assigned to represent the Commission, and to ostensibly provide objective advice to the fact finding body, Defendant Chavez routinely dabbled in matters relating to the prosecution of the case, even serving for a short period as the prosecuting attorney, and frequently conferred with the Commission's "prosecutor", Assistant Attorney General Rebecca Branch in direct violation of the Attorney General's own Policy issued October 1, 2012. That Policy prohibits *ex parte* communications  between assistant attorneys general working in "parallel proceedings" where one is an administrative prosecutor and the other acts as counsel to the same client administrative agency. The Policy was intended as a safeguard to preserve and protect the rights of New Mexico citizens from governmental abuse – including the rights of due process and access to the courts at issue in the instant case – and, as such, Defendant Chavez acted outside the scope of her  authorized discretionary duties as a licensed New Mexico attorney and assistant attorneys general as set forth in clearly established state law and policies of the attorney general.

76.    On July 13, 2016, five days after issuance of the NCAs, Plaintiffs' counsel in the Real Estate Commission proceeding, attorney Marrs, made a formal request, pursuant to § 61-1-8,

NMSA, that the Real Estate Commission permit inspection and copying of "the documents showing when and by what means the Commission discovered the conduct that is the basis for the contemplated action." That inspection occurred on August 1, 2016, in the presence of Branch, Ciddio and the Commission's investigator, Defendant  Carter, who produced a 164-page compilation of documents they represented to be the Commission's complete file.

77.    None of the documents revealing Lightle's role in developing a case against Plaintiffs were contained in the 164 pages of documents, including any interviews, notes of any meetings by Lightle, Kramer or Owens with Donham or with any other person(s) associated with a similar transaction.

78.    On August 1, 2016, attorney Marrs wrote to Defendant Kramer stating: "With this email, I'm asking the AG's office to be careful to preserve all its records regarding your office's (including, in particular, your own) dealings with the Commission…on and before July 2, 2014 vis a vis the subject matter of the Donham complaint."

79.    After several fruitless email exchanges with Defendant Kramer, Plaintiffs' counsel, attorney Marrs, received a response from Branch stating: "I know this can be confusing because I work for the AG, but I am the Administrative Prosecutor for the Real Estate Commission in the Trubow/McBride matter. David Kramer is not an attorney for the REC. If you want the information you are asking David for from the AG's office, you either need to make a public records request under IPRA and have it sent to the IPRA custodian for the AG's office ... or have a subpoena issued by the commission and serve it on the AG's office."

80.    In September 2016, Defendant Kramer's employment with the Attorney General's Office ended. Since that time he has been engaged in the private practice of law.

81.    On or about September 9, 2016, Plaintiffs' counsel, attorney Marrs, moved the Real Estate Commission's Hearing Officer for issuance of a subpoena *duces tecum* directed to the Attorney General seeking, among other things, discovery of documents, electronic messages and other tangible things in the Attorney General's possession, custody or control that memorialized communications on or before July 2, 2014 between Defendant Kramer regarding the subject matter of the Donham Complaint. The Hearing Officer approved and issued the subpoena *duces tecum* on January 10, 2017. Thereafter, the subpoena *duces tecum* was served on the Attorney General.

82.    By June 27, 2017, the Attorney General still had not responded to the January 10, 2017, subpoena *duces tecum*, and on that date Plaintiffs' counsel, attorney Marrs, delivered a set of requests to inspect public records to the Real Estate Commission, pursuant to New Mexico Inspection of Public Records Act, § 14-2-1, et seq., NMSA 1978 ("IPRA"), seeking, among other things, file materials of the Consumer Protection Division and the Real Estate Commission, which would have encompassed the investigative activity of Kramer, Lightle, Moise, Carter and Ciddio. A true and correct copy of the IPRA Request is attached hereto as Exhibit "B" and incorporated herein by reference. In fact, and prior to this IPRA request, in April and May 2017, Defendant Chavez had already requested Defendant Kramer's investigative file and related materials. Whether Defendant Chavez obtained the file and related materials is, at this time, unknown to Plaintiffs.

83.    Later in the day on June 27, 2017, Branch responded, claiming that "the subpoena fell through the cracks," and adding: "We will be working diligently in getting respon[ses]" but that "[i]t will take some time as we have to have our IT folks access Mr. Kramer's files".

84.    The next day, Defendant Ciddio wrote to Defendant Chavez and Branch asking for their input in how to respond to the IPRA requests.  Upon information and belief, Defendants

21

Ciddio and Chavez, and others, met and conspired to conceal their use of wrongfully obtained and privileged information from Plaintiffs with the intention of not producing the requested documents and of thwarting Plaintiffs' rights to a fair hearing.

85.     On July 10, 2017, the public records custodian for the New Mexico Regulation and Licensing Department delivered a set of eight (8) documents to attorney Marrs, namely copies of a subpoena for Plaintiff McBride's deposition, Plaintiffs' motion to vacate the Commission's hearing, an email chain between Branch and Marrs concerning the witness list for the hearing, an email chain concerning a moratorium on Marrs' subpoena, the subpoena for document production issued by the Commission's hearing officer, an email chain concerning coordination of deposition dates, a redacted copy of the Attorney General's Witness List for the hearing, and the deposition notice for Lisa Donham.  Documents, notes, file materials and emails that had been specifically requested in the possession of Defendants were not produced, nor was any objection made to production of such materials.

86.     The Attorney General's response to the IPRA Request, and the documents produced, concealed the tell-tale documents evidencing Lightle's involvement and other communications evidencing the participation of Defendants Owens and Kramer in the invasion of Plaintiff's attorney-client privilege.

87.     On August 11, 2017, Plaintiffs' counsel, attorney Marrs, served the Real Estate Commission with a motion to compel the Attorney General's compliance with the subpoena *duces tecum*.

88.     On September 8, 2017, the morning of the hearing on the merits of the Real Estate Commission's case against Plaintiffs, Branch produced a small batch of incomplete and mostly unresponsive documents pursuant to the subpoena *duces tecum*, but did not produce Defendant

22

Kramer's file, which would have contained information revealing Lightle's involvement in developing a case against Plaintiffs, and the extent to which the case against Plaintiffs' was predicated on privileged and confidential information. Branch and Defendant Chavez falsely claimed the files of Defendant Kramer and the Consumer Protection Division were in archives, had been requested and would be produced.

89.     The documents withheld by the Attorney General's Office also failed to reveal Defendant Carter's involvement in the investigation.  At material times to this Complaint, Defendant Carter attempted to conceal the true nature and extent of his involvement, beginning with his request to "remain anonymous" when he first became involved in assisting Defendant Kramer in investigating Plaintiffs.  In his testimony at the merits hearing, Defendant Carter falsely testified under oath that the sole basis for his knowledge of the facts related to the case against Plaintiffs was obtained after becoming Chief Investigator for the Commission from his review of Defendant Kramer's file, whereas, in fact, Carter was extensively involved in the investigation itself, including discussions with Defendant Kramer in mapping out a case against Plaintiffs.

90.     Had the Attorney General's Office complied with Plaintiffs' subpoena *duces tecum*, it would have revealed Carter's bias and prejudice and would have demonstrated the falsity of his testimony, thereby enabling full and complete cross-examination.

91.     Plaintiffs defended the case brought by the New Mexico Attorney General seeking revocation of their brokers' licenses without any knowledge that the Attorney General had built its case against them upon privileged and confidential information that was obtained from a paralegal previously assigned to work on those matters for Plaintiffs' former attorney.

92.     By not disclosing Lightle's involvement in development of the case against Plaintiffs, which was discovered only after revocation of Plaintiffs' licenses when a public records

custodian produced an unredacted copy of the Lightle email chain (Exhibit "A"), Defendants prejudiced Plaintiffs' presentation of their case – and defenses – before the Commission, and prevented a full and fair hearing before the District Court in the subsequent administrative appeal of their case by denying Plaintiffs a full and fair appellate record with evidence of the tainted file.

93. Had Plaintiffs obtained Defendant Kramer's file materials before the hearing – including documents exposing Lightle's involvement—Plaintiffs would have been afforded the opportunity to go directly to the Real Estate Commission to request appropriate relief, including dismissal and/or sanctions, or to the District Court to seek a writ of superintending control or other remedies, including dismissal of the case based upon the invasion of their informational privacy rights and violation of their fundamental rights of due process.

94. As a direct and proximate result of Defendants' intentional and knowing use of privileged and confidential information, and the intentional and knowing cover up of that fact – including the bad faith spoliation of material evidence – Plaintiffs were denied due process and the right to a full and fair opportunity to defend their brokers' licenses in a fair hearing. Moreover, because of the limited nature of administrative appellate review permitted under the law, the subsequent District Court review could consider only those matters in the record before the Commission.

95. Because the nature and extent of Defendants' deception was discovered only after issuance of the final order of the Commission revoking Plaintiffs' licenses, Plaintiffs and the District Court were deprived of the material facts with which to conduct an appropriate review. Plaintiffs were thereby denied a full and fair hearing on appeal, and were denied their rights to access the courts and to seek a fair hearing and appropriate remedies.

96.    The Report of the Commission's Hearing Officer, Defendant Kurstin Johnson, which was prepared and submitted to Johnson by the Commission's counsel, Defendant Chavez, was issued October 5, 2017. Plaintiffs' counsel, attorney Marrs, asked to make objections to the Report and prepared the objections. Defendant Chavez rebuffed his request. As a consequence, Plaintiffs' objections to the Hearing Officer's Report were not presented to the Commission prior to issuance of its Order.

97.    Upon information and belief, Defendant Chavez requested from the Consumer Protection Division the investigative file of Defendant Kramer's months prior to the merits hearing, had access to that file and used it contents in the course of preparing the Hearing Officer's Report and in representing the Commission in its deliberations.

98.    On or about December 6, 2017, the Real Estate Commission issued its Decision and Order – approved and executed by Defendant Koether – revoking Plaintiffs' brokers' licenses. Plaintiffs timely took an appeal to the Second Judicial District Court, State of New Mexico, which upheld on a record review the Real Estate Commission's Decision and Order. That decision is now on review by the New Mexico Court of Appeals, but that review does not include the issues raised in this Complaint.

**Plaintiffs' Discovery of Defendants' Violations of Plaintiffs' Rights of Due Process and Access to the Courts**

99.    In February 2018, after revocation of their licenses, Plaintiffs sent new IPRA requests for public records to the Attorney General's Office, seeking, among other documents, Defendant Kramer's emails relative to the Donham case and the file maintained by Kramer at the Consumer Protection Division.

100.    The New Mexico Attorney General has a duty to enforce the IPRA (§ 14-2-12(A)(1)), and has a correlative duty to obey the statute.

25

101.    In response to Plaintiffs' February 6, 2018 IPRA request, the Attorney General's Office now – and for the first time – produced a tranche of documents that included the Lightle email chain of June 5, 2014, which is attached hereto as Exhibit "A".

102.    In response to Plaintiffs' further supplemental IPRA request of October 10, 2018, the Lightle email chain was produced, this time in a redacted form that blacked out the "smoking gun" information that would have revealed Defendant Owens and Kramer's invasion of Plaintiffs' attorney-client privilege and the consequential violation of their fundamental rights of due process. A true and correct copy of that redacted email chain is attached hereto as Exhibit "C" and incorporated herein by reference.

103.    The redactions were made by, or at the direction of, P. Cholla Khoury, Director of the Attorney General's Division of Consumer & Environmental Protection. Khoury had been involved two years earlier in addressing the subpoena from Plaintiffs' former counsel for seeking Defendant Kramer's emails. Upon information and belief, the redactions were coordinated by Khoury with one or more of the Defendants herein, and were purposely intended to cover up the wrongful use of information provided by Lightle in the course of administratively investigating and prosecuting the license revocation case against Plaintiffs.

104.    The continuing pattern of obstruction, which included the ongoing and continued concerted action of Defendants Chavez, Ciddio and Carter, was the cause in fact and the proximate cause of Plaintiffs' denial of due process, denial of access to the courts and the other harm complained of herein.

105.    Recently, in response to the recent formal IPRA request by Plaintiffs' undersigned counsel, the Attorney General's Office continued to refuse to produce Defendant Kramer's file despite duties to have preserved the file and to produce it pursuant to an IPRA request, indicating

26

that the Office has spoliated the file, and/or has continued the obstructive conduct that prejudiced Plaintiffs' rights of due process and access to the courts in the underlying administrative proceeding.

106.    Spoliation of the Kramer file, conducted and/or coordinated by one or more Defendants named herein, was outside the scope of their authorized discretionary duties as set forth in clearly established state law and policies of the attorney general.

### Disparate Treatment of Plaintiffs Relative to Other Realtors

107.    After revocation of Plaintiffs' brokers' licenses, the Real Estate Commission caused to be published public notices announcing its action, thereby stigmatizing Plaintiffs' reputations and causing them additional damages and economic losses that are continuing.

108.    In January 2018, the Commission published the Winter-Spring edition of its publication known as "Property Lines". The newsletter included a list of recent disciplinary action decisions and orders, including *In The Matter of Martha Lynn Eden*, NMREC Case No.16-10-03-072 and *In The Matter of Jason Valentine*, NMREC Case No. 14-11-07-120. These dispositions bookended the December 6, 2017 Decision and Order against Plaintiffs: the decision in Martha Eden was issued six weeks earlier and the Jason Valentine decision was issued a week after the decision and order against Plaintiffs.

109.    The Commission rendered its decision and order in the Martha Lynn Eden case on October 23, 2017. The Commission granted Eden a conditional license on undisputed facts of egregious misconduct in contrast to the facts at issue in Plaintiffs' case, for which their licenses were revoked.

110.    The Commission found that Eden pled guilty in 2016 to a felony of "moral turpitude involving embezzlement of money from clients while working as a foreign currency investor".

The Commission further found that she was convicted of federal criminal charges brought by the U.S. Department of Justice following an investigation conducted by the U.S. Secret Service. During the investigation she lied to the Secret Service. Her fraud caused her clients to suffer losses totaling $394,000. When she "dispersed restitution to victims" following a bankruptcy proceeding, she gave "preferential treatment" to her "relatives and close friends." She pled guilty in the face of "the possibility of seven years of incarceration".

111.     The Commission regarded Eden's fitness for a license dubiously. It "was concerned that there may be a pattern of inappropriate use of other people's money". It believed she attempted to hide money from a bankruptcy estate. Since her federal felony conviction was "less than a year old" when it rendered its decision and order, the Commission remained concerned whether [respondent Eden] "is rehabilitated" and "additional time is necessary to allow [her] to fully demonstrate rehabilitation."

112.     Notwithstanding these facts and its skepticism about Eden's fitness, the Commission granted her a conditional license – a far more lenient punishment than the license revocation, fines and costs suffered by Plaintiffs.

113.     The Commission rendered its decision and order in the case of Jason Valentine on December 13, 2017. It suspended Valentine's license for six months on undisputed facts showing that Valentine forged a prequalification letter.

114.     The Commission found that Valentine "generated a fraudulent prequalification letter" as a means of gaining an advantage by showing a property he otherwise would not have been able to show. The fraud was discovered when the bank that purportedly issued the letter confirmed the letter was a forgery. The Commission concluded Valentine "generated a fraudulent prequalification letter in order to permit the showing of a property". For this misconduct, the

28

Commission suspended Valentine's license for six months. On facts far more benign, the Commission revoked Plaintiffs' licenses, imposed fines totaling $10,000 and taxed costs against Plaintiffs.

115. The discriminatory treatment of Plaintiffs, relative to other similarly situated real estate brokers, was the cause in fact and the proximate cause of Plaintiffs' denial of due process, denial of equal protection, denial of access to the courts, and the other harm complained of herein.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Denial of Constitutional Rights – 42 U.S.C. § 1983
### (Denial of Procedural Due Process:
### Defendants Kramer, Owens, Ciddio, Carter and Chavez)

116. Plaintiffs reallege and incorporate the allegations in Paragraphs 1 to 115 as though fully set forth herein.

117. Plaintiffs have a protected property interest in their real estate brokers' licenses under the Fifth and Fourteenth Amendments to the United States Constitution, which could not be lawfully removed by action under color of law without due process.

118. By their willful, deliberate, intentional and knowing conduct described herein, Defendants Kramer, Owens, Ciddio, Carter and Chavez have denied Plaintiffs their right to a full and fair hearing, and to procedural due process by revoking their real estate brokers' licenses through the invasion of their private communications with counsel. Defendants compounded the injury and the harm to Plaintiffs by virtue of the wrongful and illegal use of information derived therefrom in the course of investigating and developing a case against them, and by their intentional acts concealing their nefarious conduct, and by denying to Plaintiffs access to discoverable records and documents which would have revealed the nature and scope of the harm.

29

119. The actions of Defendants Kramer, Owens, Ciddio, Carter and Chavez, as alleged herein, were committed in their individual capacities, and in violation of clearly established federal constitutional law.

120. Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of "rights, privileges or immunities secured by the Constitution and laws" shall be liable to the injured party.

121. Because the conduct of Defendants Kramer, Owens, Ciddio, Carter and Chavez, acting jointly and severally, has deprived Plaintiffs of their rights, privileges, and/or immunities as secured by the First, Fifth and Fourteenth Amendments, Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

122. As a direct and proximate result of the actions of Defendants, Plaintiffs have sustained damages in an amount to be established at trial according to proof.

123. The actions of the Defendants Kramer, Owens, Chavez, Carter, and Ciddio were in reckless and callous disregard of Plaintiffs' constitutional rights justifying the imposition of punitive damages against these Defendants.

## Second Claim for Relief
### Denial of Constitutional Rights – 42 U.S.C. § 1983
### (Denial of Access to the Courts: Defendants Kramer, Owens, Ciddio, Carter and Chavez)

124. Plaintiffs reallege and incorporate the allegations in Paragraphs 1 to 123 as though fully set forth herein.

125. Plaintiffs have fundamental right of access to the courts to defend their protected property interest in their real estate brokers' licenses.

126. Defendants Kramer, Owens, Ciddio, Carter and Chavez have denied Plaintiffs' right to access the courts through their willful, deliberate, intentional and knowing coverup and

30

obstruction of Plaintiffs' right of lawful access to discovery of information necessary for the defense of the claims against them.

127.    The actions of Defendants Kramer, Owens, Ciddio, Carter and Chavez, as alleged herein, were committed in their individual capacities, and in violation of clearly established federal constitutional law.

128.    Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of "rights, privileges or immunities secured by the Constitution and laws" shall be liable to the injured party.

129.    Because the conduct of Defendants Kramer, Owens, Ciddio, Carter and Chavez, acting jointly and severally, has deprived Plaintiffs of their rights, privileges, and/or immunities as secured by the First, Fifth and Fourteenth Amendments, Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

130.    As a direct and proximate result of the actions of Defendants, Plaintiffs have sustained damages in an amount to be established at trial according to proof.

131.    The actions of the Defendants Kramer, Owens, Chavez, Carter, and Ciddio were in reckless and callous disregard of Plaintiffs' constitutional rights justifying the imposition of punitive damages against these Defendants.

**Third Claim for Relief**
**Denial of Constitutional Rights – 42 U.S.C. § 1983**
**(Denial of Substantive Due Process:**
**Defendants Kramer, Owens, Ciddio, Carter and Chavez)**

132.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 to 131 as though fully set forth herein.

133.    In addition to their property interest in their brokers' licenses, Plaintiffs have protected liberty interests in the privacy of their attorney-client communications.

31

134. By willfully, deliberately, intentionally and knowingly invading that interest, and using the information derived therefrom against Plaintiffs, Defendants Kramer, Owens, Ciddio, Carter and Chavez violated Plaintiffs' right to substantive due process of law.

135. Defendants' abuse of power is conscience-shocking.

136. As a result of these Defendants' conduct, as alleged herein, Plaintiffs suffered a significant extinguishment of a right or status previously recognized by state law, namely the revocation of their realtors' licenses, and the exaction of severe penalties, fines and costs. Such conduct was unconstitutionally arbitrary and does not serve any legitimate state interest.

137. The actions of Defendants Kramer, Owens, Ciddio, Carter and Chavez, as alleged herein, were committed in their individual capacities, and in violation of clearly established federal constitutional law.

138. Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of "rights, privileges or immunities secured by the Constitution and laws" shall be liable to the injured party.

139. Because the conduct of Defendants Kramer, Owens, Ciddio, Carter and Chavez, acting jointly and severally, has deprived Plaintiffs of their rights, privileges and/or immunities as secured by the Fourteenth Amendment, Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

140. Defendants' interference with Plaintiffs' fundamental rights is unconstitutionally arbitrary and does not serve any legitimate state interest.

141. As a result of the actions of these Defendants, Plaintiffs have sustained damages in an amount to be established at trial according to proof.

142.    The actions of the Defendants Kramer, Owens, Chavez, Carter, and Ciddio were in reckless and callous disregard of Plaintiffs' constitutional rights justifying the imposition of punitive damages against these Defendants.

**Fourth Claim for Relief**
**Denial of Constitutional Rights – 42 U.S.C. § 1983**
**(Administrative Conspiracy: Defendants Kramer, Owens, Ciddio, Carter and Chavez)**

143.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 to 142 as though fully set forth herein.

144.    Defendants, and other individuals employed by the Attorney General, willfully, deliberately, intentionally and knowingly invaded Plaintiffs' right to the privacy inherent in their communications with counsel, or willfully, deliberately, intentionally and knowingly acquiesced therein, or utilized such ill-gotten information in the proceeding to the detriment of Plaintiffs.

145.    Starting in the summer of 2013, and continuing thereafter, Defendants Kramer and Owens and other employees of the Attorney General's office, including Maggie Lightle, Jacque Moise, Lori Chavez, Rebecca Branch, Lyn Carter, and Cholla Khoury, met, planned, communicated and conspired with one another and others for the purpose of harming Plaintiffs and administratively depriving Plaintiffs of their due process rights protected by the United State Constitution.

146.    These persons, collectively and in various combinations, agreed upon and carried out their plans to harm Plaintiffs and deprive Plaintiffs of their due process rights, resulting in the damages described herein.

147.    The Real Estate Commission employees named herein, as well as the Defendant employees of the Attorney General's Office, demonstrated extreme improper motives, bias and prejudice toward Plaintiffs, lacked procedural indicia of objectivity, fairness, neutrality and

33

independence and caused the Commission to base its findings and legal conclusions upon tainted evidence.

148.    Defendants successfully conspired to punish Plaintiffs, and to revoke their real estate brokers' licenses without affording them procedural due process and the constitutionally mandated right of access to the courts to which they were entitled.

149.    The actions of Defendants Kramer, Owens, Ciddio, Carter and Chavez, as alleged herein, were committed in their individual capacities, and in violation of clearly established federal constitutional law.

150.    Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of "rights, privileges or immunities secured by the Constitution and laws" shall be liable to the injured party.

151.    Because the conduct of Defendants Kramer, Owens, Ciddio, Carter and Chavez, acting jointly and severally, has deprived Plaintiffs of their rights, privileges and/or immunities as secured by the Fourteenth Amendment, Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

152.    Defendants' interference with Plaintiffs' fundamental rights is unconstitutionally arbitrary and does not serve any legitimate state interest.

153.    As a result of the actions of these Defendants, Plaintiffs have sustained damages in an amount to be established at trial according to proof.

154.    The actions of the Defendants Kramer, Owens, Chavez, Carter, and Ciddio were in reckless and callous disregard of Plaintiffs' constitutional rights justifying the imposition of punitive damages against these Defendants.

**Fifth Claim for Relief**
**(Injunctive and Declaratory Relief:**
**Defendants Ciddio, Koether, Davis, Foltz, Johnson and Rollins)**

155.    Plaintiffs reallege and incorporate the allegations in Paragraphs 1 to 154 as though fully set forth herein.

156.    The dispute between Plaintiffs and the Commission, acting by and through the named Defendants Ciddio, Koether, Davis, Foltz, Johnson, and Rollins, is on-going because Plaintiffs' brokers licenses were unconstitutionally revoked by the Commission and remain revoked.

157.    Every day that Plaintiffs are unable to pursue their chosen profession, they suffer not only monetary losses, but reputational harm. By virtue of the Commission's improper revocation of Plaintiffs' licenses through violations of Plaintiffs' constitutional rights as alleged herein, Plaintiffs have been barred and deterred from working as real estate brokers, have suffered economic injury and damages, and continue to suffer under a stigmatizing "cloud" over their professional reputations.

158.    Plaintiffs' injuries and losses were caused, and continue to be caused, by Defendants' invasion of Plaintiffs' legally protected interests, and are concrete and particularized. There is a causal relationship between their injuries and Defendants' challenged conduct and it is likely that the injury will be redressed by a favorable decision.

159.    The violation of Plaintiffs' constitutional rights is clear and unequivocal; Plaintiffs are likely to prevail on the merits of their claims based upon the indisputable facts set forth herein, and they are entitled to immediate injunctive relief.

160.    In the absence of immediate injunctive relief, Plaintiffs will continue to suffer irreparable harm, which cannot be remedied with an award of monetary damages alone.

161. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

162. The Court should exercise its jurisdiction and declare that the action of the New Mexico Real Estate Commission in revoking Plaintiffs' brokers' licenses and the imposition of significant fines was improper and is, therefore, a nullity. The Court should further issue a mandatory injunction requiring that the Real Estate Commission, by and through the authority exercised by Defendants Ciddio, Koether, Davis, Foltz, Johnson, and Rollins, reinstate Plaintiffs' brokers' licenses, refund to them the sums paid in fines and costs, and take such other necessary action as to advise professionals in the real estate profession that the conduct of the Commission was wrongful and that its actions against Plaintiffs was of no force or effect.

### Sixth Claim for Relief
### Denial of Constitutional Rights – 42 U.S.C. § 1983
### (Denial of Equal Protection—Class of One – Injunctive and Declaratory Relief: Defendants Ciddio, Koether, Davis, Foltz, Johnson and Rollins)

163. Plaintiffs reallege and incorporate the allegations in Paragraphs 1 to 162 as though fully set forth herein.

164. The Fourteenth Amendment to the United States Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

165. The punitive treatment of Plaintiffs through the revocation of their brokers' licenses, was irrational and wholly arbitrary relative to the punishment of other similarly situated relators, including realtors Valentine and Eden, and in violation of the Fourteenth Amendment to the United States Constitution.

166. Under 42 U.S.C. § 1983, every person who, under color of state law, subjects any citizen of the United States to the deprivation of "rights, privileges or immunities secured by the Constitution and laws" shall be liable to the injured party.

167. Defendants' interference with Plaintiffs' fundamental rights is unconstitutionally arbitrary and does not serve any legitimate state interest.

168. Because the conduct of Defendants Ciddio, Koether, Davis, Foltz, Johnson and Rollins deprived Plaintiffs of their rights, privileges and/or immunities as secured by the Fourteenth Amendment, Defendants are liable to Plaintiffs under 42 U.S.C. § 1983 for injunctive and declaratory relief.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues triable of right by a jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request the following relief:

A. Entry of judgment against Defendants Kramer, Owens, Ciddio, Carter and Chavez jointly and severally and in their individual capacities, for violations of Plaintiffs' right to procedural and substantive due process and right of access to the courts and awarding Plaintiffs' damages in an amount to be proven at trial.

B. Entry of a judgment against Defendants Ciddio, Koether, Davis, Foltz, Johnson, and Rollins, jointly and severally and in their official capacities, declaring the action of the Real Estate Commission in revoking Plaintiffs' real estate brokers' licenses to be in violation of Plaintiffs' rights to procedural and substantive due process, right of access to the courts and equal protection and to be, therefore, null and void.

37

C.    Entry of a mandatory injunction against Defendants Ciddio, Koether, Davis, Foltz, Johnson, and Rollins, jointly and severally and in their official capacities, requiring reinstatement of Plaintiffs' real estate brokers' licenses and all rights and privileges attendant therewith, requiring that Defendants refund to them the sums paid in fines and costs, and requiring that these Defendants take all other necessary actions to advise professionals in the real estate profession that the conduct of these Defendants and the Commission was wrongful and that all punitive actions taken by them against Plaintiffs was of no force or effect.

D.    Entry of judgment against Defendants Kramer, Owens, Ciddio, Carter and Chavez jointly and severally and in their individual capacities, for punitive damages.

E.    Entry of judgment awarding Plaintiffs' their costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

F.    Granting or awarding any other relief this Court deems just and proper.

Respectfully submitted:

FELKER, ISH, RITCHIE, GEER & WINTER, P.A.

By: _____

Mark L. Ish, Esq.
William D. Winter, Esq.
Gregory S. Smithkier, Esq.
911 Old Pecos Trail
Santa Fe, NM 87505
(505) 988-4483
markish@felkerishlaw.com
williamwinter2003@yahoo.com
greg@felkerishlaw.com
*Counsel for Plaintiffs*

38